1  YEHUDA SHARON a/k/a EUGENE WARNER
   5469 Escondido St.
2  Las Vegas, Nevada 89119

3  MAILING ADDRESS:
   P.O. Box 71174
4  Las Vegas, Nevada 89170-1174

5  Tel.: (702)795-7774

6  Plaintiff in Pro Se

7              UNITED STATES DISTRICT COURT

8              SOUTHERN DISTRICT OF NEVADA

9                        *  *  *

**ORIGINAL**

10 YEHUDA SHARON, a/k/a EUGENE WARNER,      )

11 an Individual                            )   CV-S-03-0282-RLH-(LRL)

12     Plaintiffs                           )

13  vs.                                     )

14 NISSAN NORTH AMERICA, INC., and NISSAN   )

15 MOTORS ACCEPTANCE CORPORATION a/k/a NMAC,)

16 and UNITED NISSAN, INC., and             )

17 JOHN DOES I-XX                           )

18     Jointly and Severally                )

19     Defendants                           )

20                                          )

21  <u>PLAINTIFF'S, SHARON, OPPOSITION TO DEFENDANTS' NISSAN NORTH
    AMERICA, INC., NISSAN MOTORS ACCEPTANCE CORPORATION, AND UNITED</u>
22  <u>NISSAN, INC. MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
    PURSUANT TO F.R.C.P. 12 OR IN THE ALTERNATIVE MOTION TO STRIKE</u>
23  <u>PLAINTIFF'S AMENDED COMPLAINT
    AND MOTION FOR RECONSIDERATION OF ORDER DOC # 21</u>

24
       COMES NOW, Plaintiff, YEHUDA SHARON a/k/a EUGENE WARNER
25
   (referred hereinafter as "SHARON") in Pro Se, and moves this
26
   Honorable Court for an order denying Defendant's, Nissan North
27
   America, Inc.'s (referred hereinafter as "NISSAN"), Nissan Motors
28
   Acceptance Corporation's (referred hereinafter as "NMAC"), and

22/23

1  United Nissan, Inc. (referred hereinafter as "UNITED NISSAN")

2  Motion to Dismiss Plaintiff's Amended Complaint or In The

3  Alternative, Motion To Strike Plaintiff's Amended Complaint

4  pursuant to F.R.C.P. 12 filed in the above entitled case through

5  their Attorney Robert J. Caldwell, and Jeffery A. BenDavid, and

6  Motion for Clarification of Order Doc. # 21 and Motion For

7  Reconsideration of Order Doc. # 21. This opposition is pursuant

8  to Fed. R. Civ. P. 12, the Ninth Circuit Mandate dated August 8,

9  2002, and is based upon the pleadings and papers on file herein

10 and before the Ninth Circuit in a related case.

11      The Motion for reconsideration is pursuant to Fed. R. Civ.

12 P. 60(b)(1) & 60(b)(6) for clearly erroneous findings and is

13 based upon the pleadings and papers on file herein.

14

15      Dated this 6 day of June, 2003.

16

17                                    

18                                    YEHUDA SHARON - PLAINTIFF

19
    **OPPOSITION TO DEFENDANTS' NISSAN NORTH AMERICA, INC., NISSAN**
20  **MOTORS ACCEPTANCE CORPORATION, AND UNITED NISSAN, INC. MOTION TO**
    **DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12 OR**
21  **IN THE ALTERNATIVE MOTION TO STRIKE PLAINTIFF'S AMENDED COMPLAINT**

22      Defendants, NISSAN and NAMC, filed a Motion to Dismiss

23 Amended Complaint on May 23, 2003, Doc. # 19 and Defendant,

24 UNITED NISSAN joined on May 29, 2003, Doc. # 20. However, This

25 Honorable Court has already entered its Order # 21 on May 30,

26 2003, seven (7) days, which is less than fifteen (15) days after

27 service as provided by Local Rule 7-2(b). Plaintiff who does not

28 to waive any immunity or defense is opposing Defendants' Motion

1  and Joinder within the time afforded him under L.R. 7-2(b) as

2  there was no Motion for Order Shortening Time.

3

4  ### i. **Defendants' Rule 12 jurisdiction**

5  Defendants, NISSAN, NMAC, and UNITED NISSAN admit that they

6  did **not** file a responsive pleadings in this case. Checking the

7  court trial docket, no responsive pleadings were filed in this

8  case as of May 27, 2003. Just because counsels for Defendants,

9  reference to Motions 12(b)(6) as pleadings, means nothing more

10 than ignorance, especially when Defendants, NISSAN and NMAC,

11 admit on pg. 3 of *DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S*

12 *AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO STRIKE*

13 *PLAINTIFF'S AMENDED COMPLAINT* ln. 8:

14           **"Plaintiff attempted to file an amended complaint**
             **... on May 11, 2003, some eighteen (18) days after all**
15           **parties herein had filed responsive pleadings in this**
             **matter, namely motions to dismiss the original**
16           **complaint."**

17 and Defendant, UNITED NISSAN, joined in their motion.

18 Defendants, NISSAN and NMAC are represented by lawyers and

19 law firms. They are aware of Fed. R. Civ. P. 12(b) defining

20 Responsive pleadings, and of Fed. R. Civ. P. 12(a), requiring

21 them to answer the complaint in twenty days, however, they opted

22 **not** to do so.

23 Fed. R. Civ. P. 7(a) specifically defines all kind of

24 pleadings including responsive pleadings. Rule 12(b)(6) Motion is

25 not one of them.

26 In **McCrary v. Poythress** (5th Cir. 1981) 638 F.2d 1308, 1314,

27 cert. denied, 454 U.S. 865, the court ruled that:

28           **"Filing a rule 12(b)(6) motion does not act as a**
             **responsive pleading that cuts off the Plaintiff's right**

-3-

1    **to voluntarily amend its complaint."**

2    and 5A Federal Practice and Procedure $ 1350 states:

3        **The liberal amendment policy of Fed. R. Civ. P. 15
     ensures that a poorly drafted complaint will not**

4    **dismissed if it can be easily amnended to solve the
     jurisdictional problem.**

5
     The Complaint asserted the personal jurisdiction of This

6
     Honorable Court over the Defendants pursuant to 28 USCA $ 1331 -

7
     Federal Question, 28 USCA $ 1332 - Diversity of Citizenship, in

8
     addition to 28 USCA $ 1338 - Civil Actions arising under an act

9
     of Congress (15 USCA $ 1 & $ 2), 28 USCA 2201 - A Declaratory

10
     Judgment Act, and 28 USCA $ 1367 - Supplemental and Pendent

11
     Jurisdiction.

12
         Defendants challenged the jurisdiction of This Honorable

13
     Court pursuant 28 USCA $ 1332 - Diversity of Citizenship, and

14
     moved to dismiss the Complaint pursuant to Rule 12(b)(6).

15
         However, before any of the Defendant filed an answer,

16
     Plaintiff, had deleted the jurisdiction claim of This Honorable

17
     Court pursuant to 28 USCA $ 1332 - Diversity of Citizenship, and

18
     thereby rectified the jurisdictional issue of This Honorable

19
     Court, and **did** file an Amended Complaint on May 11, 2003.

20
         Not knowing This Honorable Court position on the Dismissal

21
     of the action and in light of the inconsistencies of the

22
     different courts how a Plaintiff is to serve an Amended Complaint

23
     when the jurisdiction of the court is challenged, **5A Federal**

24
     **Practice and Procedure $ 1350**, Plaintiff has 120 more days,

25
     from May 19, 2003 to serve the Amended Complaint. However, on May

26
     20, 2003, Plaintiff filed a Notice of filing An Amended Complaint

27
     was filed to draw the Court's and Defendants' attention to the

28
     Amended Complaint.

-4-

1    Upon receiving This Honorable Court's Order # 21, which
2  asserts the jurisdiction of This Court upon Defendants, Plaintiff
3  served the Amended Complaint upon counsels for Defendants on June
4  3, 2003.

5    In *DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED*
6  *COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO STRIKE PLAINTIFF'S*
7  *AMENDED COMPLAINT*, Defendants forgot to direct the court's
8  attention to *PLAINTIFF'S, SHARON, OPPOSITION TO DEFENDANTS'*
9  *NISSAN, NMAC, AND UNITED NISSAN, INC. MOTION TO DISMISS*
10 *PLAINTIFF'S COMPLAINT PURSUANT TO F.R.C.P. 12(B)(6) AND TO*
11 *DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO F.R.C.P.*
12 *12(B)(6)*, filed on May 7, 2003, of which they received a copy
13 thereof. As a matter of fact, Defendants' counsel skip such
14 event, and jump from "April 23, 2003", *DEFENDANTS' MOTION TO*
15 *DISMISS PLAINTIFF'S AMENDED COMPLAINT, OR IN THE ALTERNATIVE,*
16 *MOTION TO STRIKE PLAINTIFF'S AMENDED COMPLAINT* pg. 2 ln. 22, to
17 "May 11, 2003", *DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED*
18 *COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO STRIKE PLAINTIFF'S*
19 *AMENDED COMPLAINT* pg. 2 ln. 24.

20    **"Defendants request that the court order Plaintiff to
      refrain from filing further pleadings in this matter
21    until the Court has ruled on the pending motions for
      dismissal."**
22

23 is a moot point at this stage as Plaintiff filed the Amended
24 Complaint already pursuant to Fed. R. Civ. P. 15(a), and This
25 Honorable Court ruled on the Motion to Dismiss in its order Doc.
26 # 21 entered on May 30, 2003.

27    Defendants, not having any specific rule to empower This
28 Honorable Court to Dismiss Plaintiff's Amended Complaint, or in
   the alternative Strike Plaintiff's Amended Complaint, based the

1  jurisdiction on general and inflated "F.R.C.P. 12", Motion pg. 1

2  in. 23.

3      However, each rule 12 Motion should be drafted separately,

4  because the motion have entirely different standards of proof and

5  evidentiary requirements, thus, in order to obtain a favorable

6  Rule 12 rulings, counsels for Defendants must satisfy exacting

7  requirements. Defendants, NISSAN and NMAC, defines no

8  requirements and satisfy no requirements in their motion.

9      Since the motion is based on inflated Rule 12 and there are

10 no exacting requirements, it is obvious that Defendants, NISSAN

11 and NMAC, brought this motion frivolously and with no basis in

12 the hopes that This Honorable Court would grant such a motion.

13

14   ii. **Defendants' Irrelevant Factual And Legal Issues**

15      Defendants' reasoning to Dismiss Plaintiff's Amended

16 Complaint:

17          **"This is also one (1) of at least seventeen (17)
            lawsuits that Plaintiff has filed in State and Federal**
18          **District Court in several years."**

19 is inappropriate, irrelevant, and is **not** a Defense **nor** a legal

20 authority to Dismiss the Amended Complaint or Strike it. When

21 Defendant, NMAC, presented the same argument to the Ninth Circuit

22 Court of Appeals in the case of **Sharon vs. NMAC** Docket No.

23 01-15588 D.C. No. CV-99-1420-LRH/LRL, *Amended Complaint/Complaint*

24 Exhibit -17, the Court of Appeals scheduled oral arguments. This

25 Honorable Court instead of following the ruling of The Ninth

26 Circuit Court of Appeals, and schedule oral argument in the above

27 Motions and Opposition thereto, allowed Defendants to influence

28 him so much that his Order # 21 is factually incomplete as This

-6-

1 | Honorable Court wrote on pg. 2 ln. 5:

2 |      "On April 23, 2003, Defendant NMAC joined
Defendant United Nissan's motion to dismiss and moved
3 | to dismiss Plaintiff's Amended Complaint."

4 | However, the Amended Complaint according to This honorable court

5 | was filed Order # 21 pg. 2 ln. 5:

6 |      "On May 19, 2003, Plaintiff filed an amended
complaint in which, from what the court can discern,
7 | the major change was that Plaintiff no longer based
jurisdiction in this matter on diversity."

8 | with no mention to Plaintiff's PLAINTIFF'S, SHARON, OPPOSITION TO

9 | DEFENDANTS NISSAN, NMAC, AND UNITED NISSAN, INC. MOTION TO

10 | DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO F.R.C.P. 12(B)(6) AND

11 | TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO F.R.C.P.

12 | 12(B)(6) filed on April 30, 2003.

13 |     Defendants, counting the pages of the Amended Complaint,

14 | DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, OR

15 | IN THE ALTERNATIVE, MOTION TO STRIKE PLAINTIFF'S AMENDED

16 | COMPLAINT pg. 3 lns. 14 - 15:

17 |      "... a copy of his actual Amended Complaint, which,
18 | incidentally, consists of 257 pages."

19 | succeeded in enraging This Honorable Court against Plaintiff.

20 | Defendants can see that the Amended Complaint is only 36 pages

21 | and **not** 257 pages. If, Defendants' counting of the pages of the

22 | Amended Compliant is correct, and Plaintiff does not care to

23 | count the pages, then the Amended Complaint is 36 pages,

24 | DEFENDANT NISSAN NORTH AMERICA, INC.'s JOINDER IN DEFENDANT

25 | UNITED NISSAN, INC.'S MOTION TO DISMISS AND DEFENDANT NISSAN

26 | NORTH AMERICA, INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED

27 | COMPLAINT PURSUANT TO F.R.C.P. 12(B)(6) dated April 22, 2003 pg.

28 | 3 ln. 19: **"Although Plaintiff's thirty-six (36) page Complaint,**

1  not including its **thirty-one (31) exhibits"**, are 221 = [257 -36]

2  pages.

3      The Exhibits to the Amended Complaint/Complaint were

4  attached to help Defendants read the Amended Complaint/Complaint

5  and understand what Plaintiff's claims are and the ground upon

6  which they rest. **Conley v. Gibson** (1957) 355 U.S. 41, 47

7      For example, Amended Complaint/Complaint Exhibit -17 is a

8  true and correct copy of The Ninth Circuit Court of Appeals'

9  decision in the case of **Sharon vs. NMAC** Docket No. 01-15588 D.C.

10  No. CV-99-1420-LRH/LRL, where the whole panel of three (3)

11  circuit judges agreed with Plaintiff that Plaintiff had a right

12  to sue NMAC in the case described in *Amended Complaint/Complaint*

13  Exhibit -17, and was attached to help Defendants to understand

14  the *Amended Complaint/Complaint* pars. 47(iv); 56; & 97.

15      This lawsuit was filed on March 12, 2003, as a result of

16  Defendants, NISSAN and NMAC, absolute refusal to obey the law and

17  absolute refusal to recognize the authority of The Ninth Circuit

18  Court of Appeal to lay down the law.

19      Defendants NMAC, refusing to follow **"15 U.S.C. $**

20  **1681s-2(b)"**, as was explained to them by Circuit Judges, *Amended*

21  *Complaint/Complaint* pg. 2 par. 3, keep repeating over and over

22  again malicious and unsubstantiated facts knowing it is false and

23  deceitful. *DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED*

24  *COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO STRIKE PLAINTIFF'S*

25  *AMENDED COMPLAINT* dated May 23, 2003, pg. 2 lns. 13 - 14 reads as

26  follows:

27          **"This is the second lawsuit that Plaintiff has**
            **pending against Nissan and NMAC resulting from**
28          **Plaintiff's purchase and the financing of a 1996**
            **Nissan."**

1   However, in its *REPLY IN SUPPORT OF DEFENDANTS NORTH*
2   *AMERICA'S, INC. MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT*
3   *TO F.R.C.P. 12(B)(6) AND JOINDER IN THE REPLY OF DEFENDANT UNITED*
4   *NISSAN, INC. TO ITS MOTION TO DISMISS* dated May, 19, 2003 pg. 2
5   ln. 15 -16, Defendants claim:

6           **"This case results from Plaintiff's attempts to**
        **buy and/or lease a vehicle manufactured by Defendant,**
7       **Nissan."**

8   On May 19, 2003, Defendant, NMAC, knew that its claim of May 23,
9   2003, is deceitful. *DEFENDANT NISSAN NORTH AMERICA, INC'S JOINDER*
10  *IN DEFENDANT UNITED NISSAN, INC.'S MOTION TO DISMISS AND*
11  *DEFENDANT NISSAN NORTH AMERICA, INC.'S MOTION TO DISMISS*
12  *PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(B)(6)* dated
13  April 22, 2003 pg. 3 ln. 3 -6, Defendants claim:

14          **"This is the second lawsuit that Plaintiff has**
        **filed against Nissan in less than two (2) months. Both**
15      **lawsuits originate in a dispute between Plaintiff and**
        **Defendant NMAC stemming from the purchase and the**
16      **financing of a 1996 Nissan Quest van which Plaintiff**
        **purchased from Jack Biegger Nissan, a Nissan dealership**
17      **in Las Vegas, Nevada."**

18  On April 22, 2003, Defendants knew that their claim of April 22,
19  2003 and that of May 23, 2003 are deceitful.

20      The first lawsuit was filed on October 12, 1999, and the
21  second was filed on March 12, 2003. Two different lawsuits with
22  different causes of actions, taking place at different years,
23  where the March 12, 2003 lawsuit involves some of the same actors
24  as the October 12, 1999 lawsuit.

25

26                      **MOTION FOR RECONSIDERATION**

27      The October 12, 1999 lawsuit is as a result of Defendant's,
28  NMAC, attempts to extort "FFC - Fraudulant Finance Charges" from

1  Plaintiff. Their method was to hold onto Plaintiff's 1996-Nissan

2  Quest after it was paid off in October 1997, when Plaintiff could

3  have sold said vehicle for $ 20,000.00, to March 2003, when

4  Plaintiff was forced to Trade-In the vehicle for $ 7,500.00, and

5  only, if he bought a Nissan vehicle. The original Complaint of

6  October 12, 1999, asked This Honorable Court to Order Defendant,

7  NMAC, to release the title of the 1996-Nissan Quest to Plaintiff.

8  Defendant, NMAC, who was put on notice on October 12, 1999 that

9  Plaintiff demand the title to his 1996-Nissan Quest, absolutely

10  refused to do so, and tied such a request to the settlement of

11  the case.

12      As a result, of Defendant, NMAC, refusal to release the

13  title of the 1996-Nissan Quest to Plaintiff, and the ruling of

14  The Ninth Circuit Court of Appeals, and the events as described

15  in the March 12, 2003 lawsuit, Plaintiff filed the March 12, 2003

16  lawsuit.

17      The March 12, 2003 lawsuit, *Amended Complaint/Complaint*,

18  claims:

19          i.    The refusal to release to Plaintiff's the title of

20                his 1996-Nissan Quest, after it was paid off is a

21                monopolistic power, First Claim pg. 4 ln. 1 - pg.

22                14 ln. 14 and Sixth Claim pg. 26 ln. 23 - pg. 32

23                ln. 23, used by Defendants NISSAN and NMAC to:

24          ii.   Drive Plaintiff's 1996-Nissan Quest price down

25                from $ 20,000.00 in October 1997, Fourth Claim pg.

26                19 ln. 13 to $ 7,500.00 in March 2002, pg. 20 ln.

27                14 - 20.

28

-10-

iii.   Prevent Plaintiff from obtaining cash to do as he
       pleases, Fifth Claim pg. 22 ln. 7, including to
       pay for a surgery he needed.

iv.    Prevent Plaintiff from getting cash to use as a
       down payment to buy a car other than a Nissan,
       Fifth Claim pg. 22 ln. 8 - 15.

v.     Prevent Plaintiff from getting cash to use as a
       down payment to buy a Nissan vehicle, First Claim
       pg. 8 - pg. 14 ln. 14.

vi.    Prevent Plaintiff from buying a vehicle other than
       a Nissan using the his 1996-Nissan Quest as a
       Trade-In, Fifth Claim pg. 22 ln. 8 - 15.

vii.   Prevent Plaintiff from buying a Nissan vehicle
       using his 1996-Nissan Quest as a Trade-In, First
       Claim pg. 8 ln. 1 - pg. 14 ln. 14.

viii.  Trying to drive the price of Plaintiff's
       1996-Nissan Quest to $ 0.00, pg. 6 ln. 11 - 16;
       pg. 7 ln. 5 - 14; pg. 8 ln. 18 - 24; pg. ln. 1 -
       9; so

ix.    NISSAN would get the full cash price for a new
       Nissan vehicle forced on Plaintiff, pg. 6 ln. 11 -
       16; pg. 7 ln. 5 - 14; pg. 8 ln. 18 - 24; pg. ln. 1
       - 9

x.     At finance rates higher than NMAC extended to
       others situated similarly as to Plaintiff's credit
       worthiness, pg. 6 ln. 11 - 16; pg. 7 ln. 5 - 14;
       pg. 8 ln. 18 - 24; pg. ln. 1 - 9; pg. 10 ln. 10 -
       14 because

-11-

1         xi.    The false information, which NMAC published to

2                   credit reporting agencies, pg. 23 ln. 2 - 6, would

3                   prevent Plaintiff from getting favorable credit

4                   terms somewhere else, First Claim pg. pg. 8 ln. 1

5                   - pg. 14 ln. 14; all to benefit:

6         xii.   NMAC by charging FFC - Fraudulant Finance Charges;

7                   and/or charging EFC - Extortionate Finance Charges

8                   to restore Plaintiff's credit [5.9%, pg. 5 ln. 10,

9                   over 0%, pg. 7 ln. 1]; and by forcing him to pay

10                  the trade-In value of his 1996-Nissan Quest to

11                  benefit, NMAC's only shareholder, Exhibit -1 pg. 2

12       xiii.   NISSAN by selling new Nissan vehicles, pg. 11 ln.

13                  21 - 23, as well as getting dividends from NMAC

14                  profits.

15  If Defendants did not understand Plaintiff's 36 pages Complaint

16  and the 31 Exhibits of 221 pages attached to the *Amended*

17  *Complaint/Complaint*, including the ruling of the Ninth Circuit

18  Court of Appeals, Plaintiff in pro se would be very happy to

19  explain it to Defendants and their respective counsels. As a

20  matter of fact Plaintiff delivered a request to meet and confer

21  with counsels for Defendants.

22      NMAC ties the execution of The Ninth Circuit Court of

23  Appeals order dated August 5, 2002 to the settlement of the

24  October 12, 1999 lawsuit. As a matter of fact, it is a modus

25  operandi of NMAC as evidenced in the Legal Notices, EXHIBIT -1

26  pg. 2 par. 5 herein and EXHIBIT -2 pg. 15 of 32 par. 2 herein, in

27  the case of **Cason Et Al v. NMAC**, to tie obeying the law to the

28  settlement of the cases:

1        "5. That the settlement agreement does not
2   prevent Mr. Sharon from using the fact that NMAC agreed
    to delete his derogatory information about any of the
3   Plaintiffs listed above, given to Experian, Trans
    Union, and Equifax:"

4   The Ninth Circuit Order does not tie the actions that NMAC

5   should do to the settlement of the case, but in plain English

6   wrote:

7       "The FCRA also imposes also imposes obligations on
        entities that report information to credit reporting
8       agencies 15 U.S. $ 1681s-2(b)"

9   and reversed and remanded This Honorable Court dismissal of the

10  case. By tying obeying the law to the settlement of the case,

11  NMAC, knowingly, maliciously, and wantonly violates 15 U.S.C.A.

12  $$ 1 & 2 per Se.

13      This Honorable Court, missing **"PLAINTIFF'S, SHARON,**

14  **OPPOSITION TO DEFENDANTS' NISSAN, NMAC, AND UNITED NISSAN, INC.**

15  **MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO F.R.C.P.**

16  **12(B)(6) AND TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO**

17  **F.R.C.P. 12(B)(6)"** Doc. # 13, filed on May 7, 2003 reached the

18  following findings, which would be addressed below:

19

20  1.  **15 USCA $$ 1-2**

21      i.  **NISSAN & NMAC**

22      **"As written, these statutes do not create civil rights of**

23  **action."** *Order* # 21 pg. 3 ln. 19-20.

24      Plaintiff sued NISSAN as the parent corporation and the only

25  stockholder of NMAC stock, which exercise controls over the

26  affairs of NMAC, and as the only stockholder of NMAC which

27  benefits from NMAC's activities.

28

-13-

1   Plaintiff's allegations that NISSAN and NMAC fix the prices

2   of the used Nissan vehicles to prevent them from collapse,

3   *Amended Complaint/Complaint* pg. 20 par. 73(iii.) are corroborated

4   and substantiated by Jed Connelly, senior vice president, sales

5   and marketing, for Nissan North America. EXHIBIT -3 herein pg. 6B

6   **"Participants in our panel"** and pg. 1B **"Incentives bug foreign**

7   **automakers"** col. 3:

8   **"Used-car values collapse.**   They have to be well
    below new car prices or nobody will buy used. Low

9   prices are good if you are shopping for a used model
    but not if you're trying to sell.

10

11   'Sixty cents of every incentive dollar rolls right
    through to the used car portfolio.' said Jed Connelly,

12   senior vice president, sales and marketing, for Nissan
    North America. 'If you put $ 1,000on a new car, the

13   used car portfolio went down by $600.

14   EXHIBIT -3 is a copy of Section B: MONEY pgs. 1B - 8B, from

15   USA TODAY dated May 27, 2003, and the following are the EXHIBITS

16   herein and in this lawsuit:

17       i.   Pg. 1B    "Incentives bug foreign automakers"

18       ii.   Pg. 6B    "Participants in our panel"

19       iii.   Pg. 6B-7B "Automakers: Industry has gone global"

20       iv.   Pg. 7B    "Foreign automakers seek U.S. buyers"

21   Jed Connelly's, senior vice president, sales and marketing,

22   for Nissan North America, fear of:

23   **"Connelly:** Because we have had some recent
    success, I think the challenge we have internally is

24   that we want our people to have confidence, but we
    don't want them to cross the line and get arrogant.

25   That will breed the wrong kind of results."
    is a reality when NISSAN and NMAC operate lawlessly.

26   In this case, NISSAN and NMAC held Plaintiff as a captive

27   buyer to force him to buy a Nissan vehicle, at a higher price, at

28   a higher interest rate, and at a lower Trade-In value. Had NMAC

-14-

1 released the title of the 1996-Nissan Quest to Plaintiff,

2 Plaintiff would have not buy a Nissan vehicle.

3     Plaintiff tried to buy a **"Toyota Tacoma Truck Limited**

4 **Edition on about March 20, 2001 for about $ 27,000.00"**, *Amended*

5 *Complaint/Complaint* pg. 22 lns. 16 - 17. EXHIBIT -3 pg. 6B,

6 herein listed Toyota Motor Sales, USA as a competitor of Nissan

7 North America, Inc., and a photograph of Mr. James Press, as

8 executive vice president and CEO of Toyota Motor Sales, USA.

9 Plaintiff could not buy the Toyota nor any other vehicle because

10 NMAC was holding onto Plaintiff's 1996-Nissan Quest title and

11 refused to release to Plaintiff. Therefore Plaintiff alleged

12 lessening of competition through monopolistic means, which

13 include Tying-In the obedience of the law to forcing Plaintiff to

14 buy another Nissan vehicle.

15     Individuals can sue under the statutes. In **Roman v. Sessna**

16 **Aircraft Co.** (1995, CA10 Kan) 55 F.3d 542, 1995-1 CCH Trade Cases

17 § 71004, the court opinion has been:

18       **"Plaintiff who was employed as airplane engineer**
      **under contract had antitrust standing to bring suit**

19       **alleging that airplane companied conspired to restrain**
      **trade by agreeing not to hire each other's engineers,**

20       **where he alleged that competition in market for his**
      **services as employee had been directly impeded by**

21       **Defendants' agreement and that he was injured by**
      **agreement because it prevented him from selling his**

22       **services to highest bidders."**

23

24     ii.   **United Nisan**

25     In its Order # 21 pg. 2 ln. 1 - 4, This Honorable Court

26 wrote:

27       **"Despite not allowing the trade, one or more defendants**
      **continued to send advertising flyers encouraging**

28       **Plaintiff to trade in his car for a new one. Defendant**
      **United Nissan moves to dismiss Plaintiff's Complaint**

for Lack of Jurisdiction and pursuant to F.R.C.P. 12(b)(6)."

This Honorable Court neglect the fact that Plaintiff went to Defendant, UNITED NISSAN, who kept sending him flyers encouraging him to Trade-In his car and buy a new car on **credit**, *Amended Complaint/Complaint* pg. 4 lns. 10-11: **"we can get you into a new Nissan with payments that easily fit your budget!!"**; pg. 8 ln.: **"... with a monthly payment that fits your budget."**

In **Aluminum Co. of America v. Tandet** (1964, DC Conn) 235 F.Supp 111, the court ruled:

> **"Parties to executory contract for sale of specified goods are no longer in category of offeror and offeree, but become seller and buyer to degree sufficient to grant buyer status to sue as 'purchaser'."**

and therefore Plaintiff, SHARON, became a buyer, and UNITED NISSAN became a seller to degree sufficient to grant buyer status to sue as purchaser.

Plaintiff never alleged that NISSAN conferred with UNITED NISSAN, nor has any control over UNITED NISSAN, but that UNITED NISSAN conferred with NMAC, *Amended Complaint/Complaint* pg. 5 ln. 18 - pg. 6 ln. 10, and conspired with NMAC to prevent Plaintiff from buying a Nissan vehicle on credit and using his 1996-Nissan Quest as a Trade-In as was offered by Defendant, UNITED NISSAN, and was described in the *Amended Complaint/Complaint* **"FIRST CLAIM FOR RELIEF"** par. 8 - 54, and Exhibits -2; 6; & 8.

Without

   i. Credit terms;

   ii. A title to Plaintiff's 1996-Nissan Quest

   iii. Using his 1996-Nissan Quest as a Trade-In

   iv. Correcting the false information that NMAC

-16-

1          furnished the credit reporting agencies

2 and after driving the value of Plaintiff's 1996-Nissan Quest down

3 from $ 20,000.00 to $ 7,500.00, Plaintiff could not afford to buy

4 another vehicle by paying cash for it and not using his

5 1996-Nissan Quest as a Trade-In.

6     After, Defendant, UNITED NISSAN, learned that Plaintiff did

7 buy a Nissan vehicle, they sent him *Amended Complaint/Complaint*

8 Exhibit -10 pg. 1 where UNITED NISSAN's Sales Manager, Mr. Troy

9 Matthews wrote: "... **the general manager has given me the**

10 **authority to make every deal happen.**" and on pg. 2 Mr. Oscar

11 Pineda wrote:

12      **"I'm sure you have already purchased a vehicle from**
        **someone else by now. Congratulation! It's always fun**
13      **and exciting to buy a new automobile."**

14 Could Defendant, UNITED NISSAN, sell a Nissan vehicle to

15 plaintiff on credit and using his 1996-Nissan Quest as a

16 Trade-In? Douglas Nissan did so on March 22, 2001, within four

17 (4) months after UNITED NISSAN refused to do so.

18     According to a settlement agreement filed in the case of

19 **Cason v. NMAC**, EXHIBIT -3 pg. 11 of 32 3rd ln from the bottom

20 herein:

21      **"Plaintiffs contend that Nissan ... dealers are agents**
        **of NMAC. NMAC disputes this contention."**
22
23 and in this case, Plaintiff, SHARON, contended that UNITED NISSAN

24 was an agent of NMAC in its refusal to deal with Plaintiff.

25

26     2.    **15 USCA $ 13**

27     In its *Order* # 21, This Honorable Court cited the Ninth

28 Circuit interpretation of **Texas Gulf Sulphur Company v. J.R.**
**Simplot Company**, 418 F.2d 793 (1969) and then on pg. 4 ln. 12,

-17-

This Court wrote:

> "**Plaintiff not alleging competitive injury, fails to correctly pleads under section 13 and the part of his second claim for relief brought under section 13 will be dismissed as to all defendants.**"

While Plaintiff did **not** allege competitive injury, Plaintiff did "**forbidden competitive injury**" in the amount of $ 5,232.50, *Amended Complaint/Complaint* pg. 13 par. 52 lns. 18-20 as a result of the Trade-In Plaintiff could have gotten from UNITED NISSAN on February 28, 2001 compare to Douglas Nissan, and another injury of $ 12,500.00 as a result of the value of the 1996-Nissan Quest from October 1997 to March 22, 2003, *Amended Complaint/Complaint* pg. 20 par. 73(iii) lns. 14 - 20.

In addition, Plaintiff **did** alleged "**forbidden competitive injur**"**ies** as the difference between the price of the Nissan vehicle he purchased on March 22, 2001 to vehicles other than Nissan he tried to purchase, *Amended Complaint/Complaint* pg. 22 lns. 14 - 26 as follows:

> "**iii. for a Honda Odyssey worth about $ 28,000.00 on about March 15, 2002**
>
> **iv.   for a Toyota Tacoma truck Limited edition on about March 20, 2002 for about $ 27,000.00**
>
> **v.   for a Nissan Frontier SuperCharge Crew Cab 4*4 with long bed from United Nissan on about December 15, 2001 - EXHIBITS -2; 3; 4 & par. 8-19; 25 above herein**
>
> **vi.   for a Nissan Frontier SuperCharge Crew Cab 4*4 with long bed from United Nissan on about December 26, 2001 - EXHIBIT -2; 4; 5 & par. 20-25 above herein**
>
> **vii.   for a Nissan Frontier SuperCharge Crew Cab 4*4 with long bed from United Nissan on about January 31, 2002 - EXHIBIT -4; 6; 7 & par. 26-32 above herein**"

3.   **15 USCA $ 14**

In its *Order* # 21 pg. 4 lns. 19 - 22, This Honorable Court wrote:

> "Plaintiff never alleges that any purchase or negotiation for purchase from Defendants was premised on a condition to not use or deal in the goods of a competitor."

However, Plaintiff alleged that he could not buy another car from other competitors, *Amended complaint/Complaint* pg. 22 par. 79 lns. 8 - 17

> "ii.   an $ 18,000.00 Trade-In towards the purchase of a Dodge Caravan worth $ 25,000.00 in December 1999 from Towbin Dodge at 275 Automall Dr., Henderson, Nevada 89014; Tel.: (702)558-3800, which owned Nissan Towbin, EXHIBIT - 20, currently Douglas Nissan, EXHIBIT -11, as well as in about April 1999, using the 1996-Nissan Quest as Dodge Caravan on credit,
>
> iii. for a Honda Odyssey worth about $ 28,000.00 on about March 15, 2002
>
> iv.   for a Toyota Tacoma truck Limited edition on about March 20, 2002 for about $ 27,000.00."

as a result of NMAC holding the title to Plaintiff's 1996-Nissan Quest, and refusal to correct its incorrect derogatory information given to credit reporting agencies. *Amended Complaint/Complaint* Exhibit -17 and EXHIBIT -4 herein pg. 12 par. 3, which summarized the findings of the Ninth Circuit Court of Appeals, where there is no such economic neither statistical nor mathematical module that can change 60 payments of $ 525.10 to 62 payments of $ 525.10.

Defendants tying the release of Plaintiff's 1996-Nissan Quest on the condition that Plaintiff would buy another Nissan, and securing such deal by releasing the title to the Nissan dealer only is a per se violation of **15 U.S.C.A. $ 14** that Defendants never told Plaintiff about among other concealments,

1 neither Plaintiff bargain for to begin with.

2

3     **4.**   **15 USCA $ 15**

4     The same arguments as in **2.**   **15 USCA $ 13**, where Plaintiff

5 alleged and demonstrated forbidden competitive injury to his

6 property.

7

8     **5.**   **15 USCA $$ 1691a and 1691e; 12 CFR $$ 202.2(n), 202.4,**

9               **202.7(a) and 202.13(b)**

10     This Honorable Court wrote in its *Order* # 21 pg. 5 ln. 13:

        **"Section 1691e provides a civil remedy for**

11      **violations of section 1691, however, Plaintiff fails**
     **to assert a claim for relief under section 1691."**

12

13     The findings of This court contradicts the *Amended*

 *Complaint/Complaint* pg. 17 lns. *Order* # 21 pg. 5 ln. 4 - 5, where

14

15 it is written: **"15 USCA $ 1691e(b), (c), and (d)"**

16     EXHIBIT -5 herein is a copy of CFR section 202.14, upon

which Plaintiff relied upon in his *Amended Complaint/Complaint*.

17

18 CFR section 202.14(b)(2) specifically provides for a civil action

as follows:

19

      **"(2) As provided in this section 706(f) [15 USCS $**

20      **1691e(f), a civil action under the Act or this**
     **regulation may be brought ...**

21

22     **Amended Complaint/Complaint** Exhibits 16; 29; & 31 and

EXHIBIT -2 herein are legal proceedings of a civil case **Cason v.**

23

24 **NMAC,** in the Middle District of Tennessee, Nashville Division.

25     The Honorable Todd Campbell the District Judge in the case

of **Cason v. NMAC,** and nine (9) legal firms, EXHIBIT -2 herein pg.

26

27 5-6 of 32 find that **15 USCS $ 1691 & CFR 202.14** provides for a

private right of action.

28

1    NMAC's own internal polices and documents, *Amended*

2  *Complaint/Complaint* Exhibit -18 pg. 2 [reverse side] and Exhibit

3  -19 acknowledge that they know:

4        **"The Federal Credit Opportunity Act prohibits
       creditors from discriminating against applicants ...**

5      **because the applicant has, in good faith, exercised any
       right under The Consumer Credit Protection Act."**

6

7    This Honorable Court wrote in its *Order* # 21 pg. 5 ln.

8  15-17:

9        **"... and Plaintiff has alleged no facts showing
       that Defendants United Nissan or Nissan North America**

10     **at any time acted as a creditor."**

11

12    i. <u>Defendant, United Nissan, Inc.</u>

13    However, *Amended Complaint/Complaint* Exhibit -11 Sec. A:

14  shows very clearly: **"CREDITOR: DOUGLAS NISSAN"**, which is the

15  Nissan dealership. In the case of **Sharon v. NMAC**, *Amended*

16  *Complaint/Complaint* Exhibit -17, Jack Biegger Nissan, the Nissan

17  dealership, was the creditor initially and then NMAC becomes a

18  creditor latter on after the retail installment contract is

19  assigned to them. EXHIBIT -2 herein pg. 2/32 par. 1.1 - 1.4:

20      **"1.1 Nissan Motor Acceptance Corporation (NMAC) ... provide
     lease and retail financing for Nissan and Infiniti vehicles as**

21    **well as used vehicles of all makes, at participating Nissan ...
     dealers throughout the United States.**

22      **1.2 Plaintiff and the class they represent are**

23    **African-American and Hispanics whose vehicle retail installment
     contracts were or will be assigned to NMAC by Nissan and Infiniti**

24    **dealers, after NMAC's approve of a credit application submitted
     to it by a participating dealer.**

25      **1.3 Consumers whose contracts are assigned to NMAC must**

26    **sign a retail installment contract with a participating Nissan or
     Infiniti dealer and be approved for credit by NMAC. The retail**

27    **installment contract includes an annual percentage rate or
     'APR'".**

28

1    1.4  When reviewing credit applications, **NMAC employs a risk-based credit pricing system that uses rates for higher risk**
2    **applicants by assigning applicants to credit tiers. Each credit tier has a corresponding 'buy rate', which is the minimum rate at**
3    **which NMAC will accept an assignment of the contract."**

4    The Nissan dealerships can assign the retail contract to any

5    other financial institution other than NMAC. EXHIBIT -4 herein

6    last page, the predecessor of UNITED NISSAN, Gary Hanna Nissan,

7    assigned Plaintiff's retail contract to CitiBank, and Douglas

8    Nissan assigned Plaintiff's retail contract to Chase Automotive

9    Finance, *Amended Complaint/Complaint* Exhibit -14, after NMAC

10   refused to accept Plaintiff's retail contract, *Amended*

11   *Complaint/Complaint* Exhibits -11; 12; & 13. While Douglas Nissan

12   assigned Plaintiff's retail agreement at 3.9% and at a lower

13   price than the one offered by UNITED NISSAN, UNITED NISSAN did

14   not try even to assign Plaintiff's retail agreement at 5.9%.

15

16   ii. **Defendant, Nissan North America**

17   Defendant, Nissan North America is the parent corporation of

18   NMAC, the only shareholder of NMAC, which benefit from NMAC's

19   operations, and exercises control over NMAC activities. At least

20   legal activities. EXHIBIT -2 herein show:

21   i.   Pg. 8 of 32, that the settlement agreement reached in

22        the case of **Cason v. NMAC** has to be approved by **"Robert**

23        **E. Hanifen, Jr., Nissan North America, Inc., Terrance,**

24        **California"**

25   ii.  Pg. 30 of 32 that

26        "Any communication, verification, or notices sent
         by Class Counsel or a party in connection with this
27        Settlement Agreement shall be effected by facsimile and
         overnight courier as follows:

28

**TO NMAC:**

Robert E. Hanifen, Jr.
Senior Counsel
Nissan North America, Inc.
990 W. 190th Street, Eighth Floor
Terrance, CA 90502
Facsimile: (310)768-1199"

As such Defendant, NISSAN stands in the same shows as NMAC and responsible just as much.

6.   **18 USCA $ 1961 NOT $ 1951**

Section 1961 authorizes private civil action. While This Court wrote in its *Order* # 21 pg. 5 ln. 20-21:

> **"Section 1951 of Title 18 is a criminal statute that does not authorize private civil action."**

Plaintiff's **"SEVENTH CLAIM FOR RELIEF"**, *Amended Complaint/Complaint* pg. 32 lns. 25 -26 is:

> **"CIVIL RICO - 18 USCA $ 1961(1); 18 USCA $$ 1961(5); 1962(b); 1962(c); 1962(d); & 18 USCA $ 1964"**

Plaintiff alleged that Defendants committed "... **extortionate credit transactions, ... section 1341 (relating to mail fraud)"** *Amended Complaint/Complaint* par. 110 pg. 33 13 - 21

## DISCUSSION

It is against public policy to allow Defendants to enforce lawlessness in contradiction of the Commerce Laws 15 USCA by their actions, agreements, combinations, or any other means. Tying-In obedience of the law to enforcing illegal activities should not be tolerated nor allowed in United States of America where corporate greed creates havoc and destroys so many lives. In **Sun Valley Gasoline, Inc. v. Ernst Enters, Inc.** (9th Cir. 1983), 711 F.2d 138, 140, the court has flatly stated that

-23-

1   jurisdictional dismissal in cases permised on federal question
2   jurisdiction are exceptional and not granted merely because
3   plaintiff does not have a cause of action.

4

5                              **CONCLUSION**

6        **WHEREFORE,** Plaintiff prays for this Honorable Court to:

7   1.   Reconsider its Order # 21.

8   2.   Schedule an evidentiary hearing in this matter.

9

10       DATED this 6 day of June, 2003.

11                                          YEHUDA SHARON - PLAINTIFF

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              -24-

## CERTIFICATE OF HAND DELIVERY

1

2    I, YEHUDA SHARON, CERTIFY that on the 6 day of June, 2003, a
true copy of the foregoing **PLAINTIFF'S, SHARON, OPPOSITION TO**
3 **DEFENDANTS' NISSAN NORTH AMERICA, INC., NISSAN MOTORS ACCEPTANCE**
**CORPORATION, AND UNITED NISSAN, INC. MOTION TO DISMISS**
4 **PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12 OR IN THE**
**ALTERNATIVE MOTION TO STRIKE PLAINTIFF'S AMENDED COMPLAINT**
5 **AND MOTION FOR RECONSIDERATION OF ORDER DOC # 21**, was addressed
and hand delivered as follows:
6                   ROBERT J. CALDWELL, ESQ.
                   KOLESAR & LEATHAM, CHTD.
7                       Suite 380
                   3320 Sahara Ave., West
8                  Las Vegas, Nevada 89102

9 and

10                 JEFFERY A. BENDAVID, ESQ.
                    MORAN & ASSOCIATES
11                   630 -4th St., South
                   Las Vegas, Nevada 89101
12
received by: _Robert J Caldwell_ on the 6 day of June, 2003, at
13 the hour of: ___4:30___ p.m.

14

15

16                                        YEHUDA SHARON - Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

$EX$  /

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | |
|---|---|
| BETTY T. CASON, ROBERT F. CASON, DONALD SNEAD, WANDA SNEAD, STEPHANIE A. VAUGHN, CHAWNECY D. VAUGHN, MARY CHEATHAM, CLYDE CHEATHAM, ALBERTO ZAYAS, and MARIO ALBAN PLAZA, on behalf of themselves and all others similarly situated, )))))))))) | No. 3-98-0223 JUDGE CAMPBELL |
| **Plaintiffs,** ) | Class Action |
| ) | |
| v. )) | |
| ) | |
| NISSAN MOTOR ACCEPTANCE CORPORATION, )))) | |
| **Defendant.** ) | |

## AGREED ORDER

Yehuda Sharon a/k/a Eugene Warner has filed Objection to Joint Motion for Preliminary Approval of Settlement Agreement and to Settlement Agreement. Having considered: the Objection to Joint Motion for Preliminary Approval of Settlement Agreement and to Settlement Agreement; and the motion filed by plaintiffs without opposition from defendant NMAC, the Court hereby finds, consistent with Mr. Sharon's requests for relief, for good cause shown, and upon agreement of the parties, as follows:

1. That the settlement agreement does not preclude Mr. Sharon's Nevada action(s);

2. That the settlement agreement does not prevent Mr. Sharon from contracting with Professor Mark Cohen and using Dr. Cohen as a witness in any litigation that Mr. Sharon has

ATTEST AND CERTIFY
A TRUE COPY
Clerk
U.S. District Court
Middle District of Tennessee
By:

This document was entered on
the docket in compliance with
Rule 58, and/or Rule 79(a),
FRCP, on 3/25/03 By.

(603)

against NMAC its officers, directors, employees, parent(s), subsidiaries, affiliates, agents, and/or assigns;

3. That the settlement agreement does not prevent Dr. Mark Cohen from testifying to any of his findings and conclusions in the above entitled case as set forth in the public record in any litigation that Mr. Sharon has against NMAC its officers, directors, employees, parent(s), subsidiaries, affiliates, agents, and/or assigns;

4. That the settlement agreement does not prevent Mr. Sharon from obtaining and/or seeking to use materials that are part of the public record in any litigation he has against NMAC its officers, directors, employees, parent(s), subsidiaries, affiliates, agents, and/or assigns; and

5. That the settlement agreement does not prevent Mr. Sharon from using the fact that NMAC agreed to delete its derogatory information about any of the Plaintiffs listed above, given to Experian, Trans Union, and Equifax; and

6. That upon entry of this Order, and consistent with the parties agreement, Mr. Sharon's objection is withdrawn.

**IT IS SO ORDERED.**

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | |
|---|---|
| **BETTY T. CASON** and<br>**ROBERT F. CASON, et al.,**<br>on behalf of themselves and all others<br>similarly situated,<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**NISSAN MOTOR ACCEPTANCE<br>CORPORATION,**<br><br>      **Defendant.** | )<br>)<br>)<br>)<br>)   **No. 3-98-0223**<br>)<br>)   **JUDGE CAMPBELL**<br>)<br>)<br>)   **Class Action**<br>)<br>)<br>) |

## ORDER

A compromise of the claims having been reached, this case along with plaintiffs' eighth

amended complaint and all claims brought in that complaint are dismissed with prejudice.

IT IS SO ORDERED.

                     _Todd Campbell_
                     TODD J. CAMPBELL
                     UNITED STATES DISTRICT JUDGE

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).
FRCP on 3-21-03 By _____

606

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| **BETTY T. CASON** and **ROBERT F. CASON, et al.,** on behalf of themselves and all others similarly situated, ) ) ) ) ) | |
| | **No. 3-98-0223** |
| **Plaintiffs,** ) | |
| | **JUDGE CAMPBELL** |
| **v.** ) ) | |
| **NISSAN MOTOR ACCEPTANCE CORPORATION,** ) ) | **Class Action** |
| **Defendant.** ) ) | |

## ORDER OF FINAL APPROVAL OF SETTLEMENT AGREEMENT

**Whereas,** This Court certified this case to proceed as a nationwide class action on October 16, 2002 for declaratory and injunctive relief;

**Whereas,** By Order entered February 24, 2003 (Docket No. 578), this Court granted preliminary approval of a proposed settlement agreement between the parties (the "Settlement Agreement"), authorized the filing of an eighth amended complaint which would include a proposed Hispanic Class, and established a procedure for objections and final approval of the Settlement;

**Whereas,** The parties submitted supplemental filings to support a finding that the settlement was fair, adequate, and reasonable and consistent with the public interest, including declarations and related proofs regarding the implementation of the preapproval programs and the use of the educational funds to be paid to America Saves;

This document was entered on the docket in compliance with Rule 58 and / or Rule 79 (a).

FRCP on 3-27-03 By AV



**Whereas,** No timely objections[1] were filed in opposition to the Settlement Agreement, and any contrary arguments raised at the Fairness Hearing were untimely and without merit even if they had been appropriately and timely presented;

**Whereas,** counsel for all parties appeared before the Court at a Fairness Hearing on March 24, 2003 (the "Fairness Hearing");

**Whereas,** For the reasons set forth from the bench at the Fairness Hearing, the Court finds that the Settlement Agreement is fair, adequate, and reasonable and consistent with the public interest;

IT IS THEREFORE ORDERED THAT:

1. This Order incorporates by reference all findings in the February 24, 2003 Order of Preliminary Approval, as well as the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement Agreement;

2. The Settlement Agreement is granted Final Approval without modification;

3. This Court's Order of October 16, 2002 is modified to define the following Settlement Classes in this action as follows:

> **African American Class.** All African-American car buyers who have entered or will enter into a retail installment contract that was or will be assigned to NMAC during the period January 1, 1990 through the Effective Date of the Settlement Agreement;

---

[1] An objection by Yehuda Sharon, a non-class member, was withdrawn as set forth in Docket No. 603.

> **Hispanic Class.** All Hispanic car buyers who have entered or
> will enter into a retail installment contract that was or will
> be assigned to NMAC during the period January 1, 1990
> through the Effective Date of the Settlement Agreement.

4. Plaintiffs and their counsel's attorney fee request in the amount of six million
   dollars ($6,000,000) is approved, to be paid in accordance with the Settlement
   Agreement;

5. Plaintiffs and their counsel's request for costs and expenses in the amount of four
   hundred ninety thousand dollars ($490,000) is approved, to be paid in accordance
   with the Settlement Agreement.

6. A separate order of dismissal of this action with prejudice will be entered.

IT IS SO ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

EX 3

Exhibit # 3

See File:  Newspaper article
           to large to copy

EX 4

**IN THE MATTER OF**

**YEHUDA SHARON**

vs.

**NISSAN MOTORS ACCEPTANCE CORPORATION a/k/a/k/a NMAC,**

**and NISSAN NORTH AMERICA, INC.**

**CV-S-99-1420-RLH-(LRL)**

**MAY 27, 2003**

Prepared by

Yehuda Sharon, Accountant

# I. Introduction and Summary of Findings

This report has been prepared in the matter of **Yehuda Sharon v. Nissan Motors Acceptance Corporation** (referred hereinafter as "NMAC") and Nissan North America, Inc. (referred hereinafter as "NISSAN").

To summarize the findings of this report:

i. NMAC calculated of the interest of Plaintiff's purchase of the 96-Nissan Quest vehicle as a Compound Interest and not as a Simple Interest.

ii. The Compound Interest that NMAC overcharged Plaintiff was about $ 459.00.

iii. NMAC overcharged Plaintiff $ 61.20 of interest by crediting check # 1026 for $ 20,054.69 on 09/03/1997 instead of 08/25/1997, when NMAC received check 1026.

iv. NMAC, as a matter of doing business, took between 3 - 15 days to credit Plaintiff with the installment payments, in order to generate inflated interest.

v. NMAC, as a matter of doing business, took between 3 - 15 days to credit Plaintiff with the installment payments, in order to generate late fees.

vi. NMAC discriminated against Plaintiff by overcharging him fifteen (15) days of interest to the tune of $114.75 = [$ 7.65 * 15]

vii. NMAC, as a matter of doing business, overstates the last instalment payment.

viii. Applying NMAC's calculation of Daily-Per-Diem shows that SHARON had paid the loan to NMAC by 10/17/1997.

-2-

ix.   Applying NMAC calculation of Daily-Per-Diem show that Plaintiff overpaid NMAC his loan by $ 51.93.

x.   NMAC had no security interest in SHARON's 96-Nissan Quest after 10/17/1997.

xi.   The information that NMAC furnished the credit reporting bureaus is false and vindictive.

xii.   Dr. Mark A. Cohen's reports in the case of **Cason vs. NMAC,** show that in 1,092,863 contracts between March 1993 to September 2000, NMAC allowed its Nissan Dealers to charge its customers DFC, on an average, as follows:

1.   Whites by $ 462.00

2.   Hispanics by $ 773.00

3.   Blacks by $ 970.00

and profited from it.

xiii.   NMAC uses the Nissan dealerships all across the 50 states as conduit and agents to solicit, to arrange, and to sell NMAC's credit contracts.

xiv.   NMAC uses the mails to collect the interest payments.

xv.   NMAC published injurious falsehood about Plaintiff, SHARON, to credit reporting bureaus.


## II. Simple Interest vs. Compound Interest

There are basically two (2) ways of calculating interest.

**Simple Interest:** West's Law & Commercial Dictionary in five languages, published by West Publishing Co., 1985 vol. I pg. 537, defines "Simple Interest" as:

> "Interest calculated on principal where interest earned during periods before maturity of the loan is neither added to the principal nor paid to the lender. That paid on the principal lent as distinguished from compound interest which is interest paid on unpaid interest." **B.F. Saul Co. v. West End Park North, Inc.** 250 Md. 707, 246 A.2d 591, 598

Simple Interest is the kind of interest credit cards charge on **purchases**, and is defined and used in the business world in commerce every day, Amended Complaint Exhibit -43 pg. 29.

**Compound Interest**: West's Law & Commercial Dictionary in five languages, published by West Publishing Co., 1985 vol. II pg. 296, defines "Compound Interest" in contrast to "Simple Interest" as:

> "Interest upon interest; i.e. interest paid upon principal plus accrued interest exist where accrued interest is added to the principal for the calculation of the interest for the next period. Interest added to the principal as interest becomes due and thereafter made to bear interest." Wieland v. Loom, 79 S.D. 608, 116 N.W.2d 391, 393.

Compound Interest is the kind of interest, credit cards charge on **cash advances**, and is defined and used in the business and commercial transactions every day. Amended Complaint Exhibit -14 pg. 1 ln. 1 & pg. 1 ln. 10-11-1996: [686.26 - Interest Earned / 7.65 - Daily-Per-Diem] beginning from July 14, 1996 & Amended Complaint Exhibit -43 pg. 53-55 Appendix "C".

The crucial part of the definition of the calculation of the interest is in the word period, because the period defines the calculation of the Periodical Interest Rate.

The payments in Plaintiff's, SHARON, contract were monthly and therefore the Periodical Interest Rate is: 1.006% [12.08/12].

Plaintiff calculated the interest based on a monthly interest of 1.006%, Amended Complaint Exhibit -11.

-4-

## III. Analysis of The Interest NMAC Charged Plaintiff

Exhibit -14 pg. 1 of the Amended Complaint was prepared by Defendant, NMAC on "10/11/96" and Exhibit -14 pgs. 2-3 of the Amended Complaint were prepared by Defendant's, NMAC, expert witness, Mr. Bruce Gardiner, CPA on "08/18/2000". Looking at the Amended Complaint Exhibit -14 pg. 1 ln. "10/11/96" column "(F) Interest Earned" as of 10/11/96 shows an amount of $ 680.86.

The Daily Interest Rate or "Daily Per Diem", Amended Complaint Exhibit -14 pg. 1 ln. "10/11/96" col. "(F)" for the period of 7-14-96 - 10/11/96 is $ 7.65.

The amount of days from 7/14/96 - 10/11/96 is ninety (90) days for which a Daily-Per-Diem was calculated: $ 686.26 = 7.65 * 9, however, $ 459.00 [$ 7.65 * 60] should have been interest free according to the agreement that Plaintiff had with Jack Biegger Nissan, the Nissan dealership upon signing the contract on July 13, 1996.

Adding the $ 459.00 interest to the initial balance made the calculation of the interest a Compound Interest calculation and **not** as a Simple Interest Calculation. The Calculation of the interest as Compound Interest instead of a Simple Interest, evidenced itself in the loan balance of "$ 23,276.03", which is higher than the initial balance of $ 23,114.87. It is the definition of Compound Interest as define by West's Law & Commercial Dictionary in five languages, published by West Publishing Co., 1985 vol. II pg. 296.

In his report dated September 15, 2000 pg. 1 "Program Testing"

> "I have performed an independent evaluation of the Amortization Program used by Nissan Motor Acceptance Corporation (NMAC). The evaluation consisted of testing the NMAC software against other amortization software

used in the accounting industry. Exhibit 'A' **[Amended Complaint Exhibit-14 pg. 2-3]** is the NMAC amortization schedule and the amortization schedule prepared by me. These schedules display the Life of the loan had each payment been made on time for the entire five-year duration of the loan.

The conclusion of this testing is that the programs generated nearly identical results. My program generated a $1.58 rounding difference and the NMAC program generated a $ 5.10 rounding difference. The difference between the rounding differences equals $ 3.52, which is not significant." **[Emphasis of writer]**

Mr. Bruce Gardiner, CPA, comes to the same conclusion that NMAC's interest calculation is a compound one.

NMAC's Daily-Per-Diem calculation for the following period of "11/11/96" is $ 7.70, Amended Complaint Exhibit -14 pg. 1 was prepared by Defendant, NMAC on "11/11/96" col. (E)

Applying NMAC's calculations of Daily-Per-Diem, Amended Complaint Exhibit -3, the Daily-Per-Diem should have been: $ 7.53 and **not** 7.70 [23,114.87 - 459.00] * .1208 / 366} and so on down the line of col. "(E)". EXHIBIT -1 of this report shows the interest overcharge as a result of the Compound Interest Calculation from 7/14/96 - 8/11/01. EXHIBIT -1 "11/11/1997", and EXHIBIT -2 "11/11/1997", shows that Plaintiff's loan was paid in full by October 17, 1997.

NMAC charges Compound Interest even though their contract reads: "SIMPLE INTEREST VEHICLE CONTRACT AND SECURITY AGREEMENT", Amended Complaint Exhibits -9 & 18

## IV. NMAC Discriminated Against Plaintiff by Overcharging Interest

NMAC sent a fax to the Jack Biegger Nissan on 8/10/1996, Amended Complaint Exhibit -2 pg. 2 item 12 & Exhibit -7, a correction notice, where it writes the dealership that the 1st

payment exceed went 60 days which exceed maximum, 45 days, allowed.
NMAC asked Jack Biegger to have SHARON come in and initial the
agreement. The dealership never notified SHARON of the request,
neither NMAC notified SHARON of the request, even though NMAC knew
SHARON address and phone number, because they sent a statement to
Mr. SHARON dated prior to 09/11/1996, which is a month before
10/11/1996 where the first payment was due. Had NMAC contacted
SHARON or made sure that the contract was initialed by Plaintiff it
would have learned the actual terms of the agreement. While, NMAC's
Expert Witness, Mr. Bruce Gardiner, CPA, wrote that in his opinion
Plaintiff did not pay the full amount of the contract, his client,
NMAC, knew that the terms on which it based its amortization
scheduled were questionable at the very least and needed
clarification. During the litigation so far, NMAC, introduced over
ten (10) copies of its contract with the Plaintiff and none bears
the Plaintiff's initials.

## V. NMAC Inflated the Interest Amount of Check 1026

SHARON sent check 1026 for the amount of $ 20,054.69, Amended
Complaint Exhibit -15, to NMAC on August 22, 1997 with a postal
return slip, Amended Complaint Exhibit -16. NMAC received check
1026 on August 25, 1997, Amended Complaint Exhibit -16, however it
credited SHARON on September 3, 1997 for the funds, Amended
Complaint Exhibit -16.

As a result of crediting SHARON for the funds on check 1026
on September 3, 1997 and **not** on NMAC charged SHARON nine (9) days
of interest, Amended Complaint Exhibit -14 last page "09-03-1997".

-7-

NMAC's Daily-Per-Diem interest for the period of 08/11/1997 - 09/11/1997 is $ 331.24 according to NMAC's Expert Witness, Mr. Bruce Gardiner, CPA, Amended Complaint Exhibit -14 last page "09-03-1997". Therefore, NMAC overcharged SHARON $ 60.84 = [$ 331.24 * 9 / 49] of interest according to its own Expert witness, and $ 62.10 = [6.90 (Daily-Per-Diem on 07/11/97 - Amended Complaint Exhibit -14 pg. 1) * 9] according to NMAC notes, an average of $ 61.20.

## VI. NMAC Inflated the Interest of Some Payments

NMAC receives the payments usually within three (3) days, Amended Complaint Exhibit -16, however, NMAC, credited the payments to SHARON in periods ranging from 3 to 15 days. NMAC charged inflated interest for the periods over three (3) days. Applying NMAC's Daily-Per-Diem methodology, Amended Complaint Exhibit -14 pg. 1 and Exhibit -17, shows that NMAC overcharged Plaintiff inflated Interest to the tune of $ 349.08.

## VII. The Effect of Fifteen (15) Days of Interest

Taking NMAC Correction Notice and adjusting the interest by reducing the amount by $ 114.75 =  [$ 7.65 (Amended Complaint Exhibit -14 pg. 1 "10/11/1996" ) * 15], the last payment would be reduced by at least that amount, which would have been $ 405.15 [$ 519.90 - 114.75] and **not** $ 525.10.

## VIII. NMAC Overcharged Plaintiff Late Fees

According to NMAC's Expert Witness', Mr. Bruce Gardiner, CPA, Report dated September 15, 2000, Amended Complaint Exhibit -13 pg.

2 par. 1 ln. 4: **"The amount of $660.17, which include two $15.00
late fees."**, However, the amount which was charged off was reported
at $ 675.60, Amended Complaint Exhibits -25; 29 pg. 2 of 10 **"NISSAN
MOTOR ACCEPTANCE"**; 30: pg. 2 of 12 **"NISSAN MOTOR ACCEPTANCE"**; 31:
pg. 1 "NMAC" and "NISSAN MOTOR"; 32: pg. 1 "NMAC" and "NISSAN
MOTOR"; 33: pg. 2 "Nissan Acceptance" and "NISSAN MOTOR"; 34:
"NISSAN ACCEPTANCE CO"; 36 pg. 5: "NISSAN MOTOR ACCE"; 36 pg. 5:
"NISSAN MOTOR ACCE"; 36 pg. 5: "NISSAN". The $ 675.60 amount
includes three (3) late fees of $ 15.00, which should have not been
charged.

## IX. Last Installment Payment

The last installment in an installment payment is very rarely
the same as the other installments. The last installment is smaller
than the other installment. However, it is amazing that NMAC,
through the Nissan Dealerships, manages to get all the installments
to be the same amount. Amended Complaint Exhibit -9 "SECTION: B
DISCLOSURE MADE IN COMPLIANCE WITH FEDERAL TRUTH-IN-LENDING ACT
Number of Payments 60 Amount of Payments 525.10"

Truth-In-Lending Act, 15 USCA $ 1638(a)(6) states in
pertinent part:

> **"(a) Required disclosure by creditor. For each consumer
> credit transaction other than under an open credit
> plan, the creditor shall disclose each of the following
> items to the extent applicable: ...**
>
> **(6) The number, amount, and due dates or period of
> payments scheduled to repay the total of payments."**

as evidenced in EXHIBIT -3 to this report.

Exhibit -14 pg. 1 of the Amended Complaint, which was
prepared by Defendant, NMAC, last line "09/11/01" shows that the

-9-

last payment should have been $ 520.00 if the payments would have been paid on time. Amended Complaint Exhibit -14 pgs. 2 & 3, were prepared by Defendant's, NMAC, Expert Witness, Mr. Bruce Gardiner, CPA on "08/18/2000" shows, Amended Complaint Exhibit -14 pg. 3 "09-11-2001" that the last payment would have been $ 521.43 if the payments would have been made on time and not doubting NMAC's calculation.

This Expert Witness' report EXHIBIT -2 pg. 2 "08/11/2001" show that the last payment would have been $ 229.38.

NMAC continues to do so, even though it knows that overstating the last payment violates the Disclosure Made in Compliance With Federal Truth-In-Lending Act as evidenced in Amended Complaint Exhibit -18 "SECTION: B DISCLOSURE MADE IN COMPLIANCE WITH FEDERAL TRUTH-IN-LENDING ACT Number of Payments 1 Amount of Payments 568.63"

This point is very important when it comes to NMAC, because NMAC and its employees demand such last overpayment in full, as evidenced in NMAC's Amended Answer and Counterclaim on February 15, 2000, which is document # 6, page 9 par. 4: **"SHARON agreed to pay Jack Biegger Nissan 60 equal monthly installments of $525.10 beginning October 11, 1996."** NMAC and its employees know that when the last installment is not the same as the other installments it should be reported differently, otherwise they violate the Truth-In Lending Act. EXHIBIT -3 herein

## X. Applying, NMAC's, Daily-Per-Diem Calculation Shows That Plaintiff Paid Off His Loan

I applied NMAC's method and calculation of Daily-Per-Diem to the terms of the agreement in EXHIBIT -1. The calculation shows

conclusively that Plaintiff paid off his loan by October 17, 1997 the latest.

## XI. Applying, NMAC's, Daily-Per-Diem Calculation Shows That Plaintiff Overpaid His Loan

In applying NMAC's method and calculation of Daily-Per-Diem to the terms of the agreement in EXHIBIT -1. The calculation shows conclusively that Plaintiff paid $ 51.93 more and over what he should have. However, even this was not enough to NMAC, as NMAC accelerated the contract and wanted more money, Amended Complaint Exhibit -25, which it was not owed by Plaintiff, and was not entitled to.

## XII. NMAC Did NOT have Any Security Interest in the Plaintiff Vehicle after 10/17/1997

After the loan was paid in full, on October 17, 1997, NMAC did not have any security interest in the 96-Nissan-Quest. NMAC's failure, to contact Plaintiff to find out the terms of the agreement between Plaintiff and Jack Biegger Nissan, and secure their request for Plaintiff's initials on the contract, shows a fraudulent intent by NMAC to increase its profit by forcing higher interest payments instead of rectifying the situation.

## XIII. Disclosure Made In Compliance With Federal Truth-In-Llending Act

The agreement calls for the borrower, Plaintiff in this case, to pay the creditor, Jack Biegger Nissan in this case, the amount of $ 23,411.78 at 12.08% until paid in full. The agreement does **not** call for Plaintiff **"SHARON agreed to pay Jack Biegger Nissan 60 equal monthly installments of $525.10 beginning October 11, 1996."**

-11-

as NMAC's Amended Answer and Counterclaim dated February 15, 2000, which is docket document # 6, page 9 par. 4, claims.

NMAC, knowing that the last installment is less than $ 525.10 by their own calculation and by their Expert Witness' calculation, knows that the disclosure was false.

## XIV. NMAC Furnished False Information to Credit Reporting Entities

There is no such mathematical, neither economics nor statistical module or otherwise mathematical calculation that would increase 60 payments of $ 525.10 to 62 payments of $ 525.10. Therefore, NMAC's reporting that the terms of the contract between Plaintiff and NMAC were 62 payments of $ 525.10, Amended Complaint Exhibits -25; 29 pg. 2 of 10 **"NISSAN MOTOR ACCEPTANCE"**; 30: pg. 2 of 12 **"NISSAN MOTOR ACCEPTANCE"**; 31: pg. 1 "NMAC" and "NISSAN MOTOR"; 32: pg. 1 "NMAC" and "NISSAN MOTOR"; 33: pg. 2 "Nissan Acceptance" and "NISSAN MOTOR"; 34: "NISSAN ACCEPTANCE CO"; 36 pg. 5: "NISSAN MOTOR ACCE"; 36 pg. 5: "NISSAN MOTOR ACCE"; 36 pg. 5: "NISSAN", was false by any all theories of application. It shows that NMAC increased the amount of the contract by at least $ 1,050.20 [$ 525.10 * 2].

Reducing the $ 1,050.20 by the amount that NMAC charged off, shows that NMAC was overpaid $ 374.60 [$ 1,050.20 - $ 675.60]

## XV. Read No Evil; See No Evil; Know No Evil; Benefit From Evil

All along, NMAC took the attitude that it knows nothing wrong was going on, and if it suspected something wrong, it did not want to know about it. This attitude reached a climax in the deposition of Mr. Warren York. Plaintiff, talked on September 20, 1997,

Amended Complaint Exhibit -21, to a person who had introduced
himself as Mr. York and later sent a letter addressed specifically
to Mr. York, Amended Complaint Exhibits -21 & 22. However, in his
deposition Mr. York denied ever talking to Plaintiff. As a result
of Plaintiff's telephone conversation with Mr. York, Plaintiff,
sent a letter address directly to Mr. York, Amended Complaint
Exhibits -21 & 22.

When Mr. York was asked in his deposition on May 12, 2000,

"Q. Would you go from September 20th, after, and say what was
going on or what was spoken?"

"A. September 26, 1997, a representative called you. You
stated you had sent the payoff on the accounts; stated you
used your own calculations for the payoff; states he's not
sending any more money for payment, advised if not, vehicle
would be charged off; said in that case, we'll see us in
court. Will check with Mr. York regarding copies of letters."

"Q. So in that conversation your name was mentioned; is this
correct?"

"A. That's correct."

"Q. In what regard was it mentioned?"

"A. Regarding a letter you supposedly had sent."

"Q. Did you ever receive a letter?"

"A. I don't recall receiving a letter right now."

"Q. Can anybody else receive the letter?"

"A. Yes, Various people could."

"Q. And they will never tell you?"

"A. Generally the correspondence comes into the office. it's
delegated out to certain representatives to handle, to make
contact with the customers regarding what the situation was."

"Q. If a letter would name Mr. York specifically, would it
reach your desk?"

"A. Not necessarily."

"Q. In that letter that was sent to Mr. York, was there a
payment attached?"

-13-

"A. I do not know. I have no idea."

NMAC's modus of operandi: (1) pleading ignorance and refusing to disclose documents, Amended Complaint Exhibits -3; 4; 5; 6; 7 before it was force to disclose in this lawsuit; (2) avoiding any direct communication with Plaintiff; and (3) encouraging indirectly communication between Jack Biegger Nissan and Plaintiff, masterminded and conspired with some Nissan Dealerships to benefit from such ignorance, and in this case benefited from it. While there is no evidence that NMAC split any ill-gotten profit with Jack Biegger Nissan in this case, legal documents in the case of **Cason v. NMAC**, revealed that NMAC conspired with Nissan Dealerships to hike the interest rate of its customers and later split the excess with the dealerships.

## XVI. NMAC's Uses Of And Relation With Nissan Dealerships

NMAC uses the Nissan Dealerships nationwide to solicit customers to have financing with NMAC. Then with the cooperation of the dealerships, hikes the rate of the interest rate by REHASHING, which means denying credit until the rate reaches a certain higher percentage than the customers could qualify somewhere else. After such transaction has been secured, NMAC would split the money with the dealership, Amended Complaint Exhibits -8; 43 pg. 22 Table 6; & 44.

In the case of **Cason v. NMAC,** Dr. Mark Cohen determined that NMAC profited from its customers by charging them DFC - Discretionary Finance Charges without telling them, as follows:

1.   Whites by $ 462.00 May 17, 2001 pg. 5

2.   Hispanics by $ 773.00 October 17, 2002 pg. 5 Table 1

-14-

3.   Blacks by $ 970.00 May 17, 2001 pg. 5

As Dr. Mark Cohen, wrote in his report dated August 28, 2000, Amended Complaint Exhibit -43 pg. 29 ln. 17:

> "That is essentially what happens when a mark up is added to interest rate on NMAC customers. Changes to any of the following elements of a loan will increase the rate at which interest compounds, making monthly payments higher -- and total interest over the life of the loan higher: increasing the term, increasing the interest rate, increasing the amount financed."

When NMAC gets caught, it shifts the blame unto the Nissan dealerships, as if it did **not** know, and did **not** participate in increasing the amount financed. In the case of **Cason v. NMAC**, NMAC filed a lawsuit against the dealership Action Nissan, Amended Complaint Exhibit -8, pg. 1 col. 2 last line, however, in **Sharon v. NMAC**, the dealership, Jack Biegger Nissan went out of business since about February 1997.

Upon receiving a copy of Plaintiff's credit application and other documents which NMAC was requested to produce, this report may be supplemented.

## XVII. Plaintiff's Claim Of "Publication of Injurious Falsehood"

NMAC is a financial company, loaning money to customers to buy Nissan vehicles and/or vehicles from Nissan dealership throughout the country.

As part of determining a loan, the buy out rate, and the terms of a loan, NMAC looks at a credit report of the borrowers. NMAC looked at Plaintiff's Credit History, Amended Complaint Exhibits -26 & 34 pg. 1 of 2 under "COMPANIED THAT REQUESTED YOUR CREDIT HISTORY" "03/25/03 **NMAC**", to determine whether to loan him money to buy the Nissan Truck described in Amended Complaint

-15-

Exhibit -18.

Amended Complaint Exhibit -43 pg. 18 includes the testimony of Dr. Thornton, NMAC's expert Witness in the case of **Cason v. NMAC, "Accounting for the 'Cost of Servicing' High Risk NMAC customers"**

"Dr. Thornton states in her report of July 9, 2001 (p. 36-7) 'The business justification of charging markups to customers with difficult credit problems id to cover the variable costs." This argument is later used to justify her inclusion of customer credit history in a regression model that purports to explain markup and in defining which customers are 'similarly situated.' Essentially she argues that customers with worse credit history entail higher 'variable cost' for the dealer thereby 'justifying' higher markups. The following deposition testimony illustrates this argument (Thornton deposition, pp 214-5):

Q. How do credit characteristics impact the markup?
A. Well, as I stated in my report, if you are a credit risk, it's going to be potentially more difficult for the dealer to obtain financing for the customer.
Q. Mm-hmm. So how does that translate to markup?
A. It's a cost.
Q. What do you call those costs?
A. Variable costs.
Q. So is there any other aspect of the credit characteristics that impacts markup?
A. On pg. 28, I talked about the time and resource costs associated with purchase.
Q. What do you include in those categories? What are you talking about, time and search costs?
A. If one is attempting to find financing for a particular customer, that time costs and resource cost is not the same. And also if you're servicing one customer that requires a lot of time and resource cost, it's not just the time associated with obtaining that financing; it's the opportunity cost associated with finding financing for that customers. Opportunity cost is what you are giving up."

In essence, NMAC, is aware that derogatory information creates credit risk, and would increase the costs of obtaining financing, if a customer could get any. As a matter of fact, NMAC

preys on customers with credit risks. NMAC preyed on Plaintiff in **Sharon v. NMAC,** Amended Complaint pg. 25 - pg. 26 **"Publication of Injurious Falsehood",** and Amended Complaint Exhibits -26; 27; 29; 30; 31; 32; 33; 34; 35; 36; 37; & 38. As a matter of facts, NMAC was so threatening and malicious in its publication of injurious falsehood that First Union Home Equity, Bank, N.A. refused to extend financing to Plaintiff, "... **due to a notice of repossession reported by Experian",** Amended Complaint Exhibit -35. Examining, Plaintiff's, SHARON, credit reports from that period, Amended Complaint Exhibits -29; 30; 31; 32; 33; 34; & 36 show that the **only** derogatory, which is/was false, information in Plaintiff's credit report was that of NMAC's charging off $ 675.00 for defaulting on a car loan.

## XVIII.Conclusion

NMAC was paid in full from Plaintiff, the loan amount that Plaintiff had with Jack Biegger Nissan. As a matter of fact, NMAC was overpaid for what the agreement between Plaintiff and Jack Biegger Nissan called for.

The last payment of the contract between Sharon and Jack Biegger Nissan is less that $ 525.10, had the paymnet paid as scheduled.

NMAC, trying to increase the interest amount beyond what was called for by the agreement between Plaintiff and Jack Biegger Nissan, violated the laws, and tried to enforce the collection of unjustly profits, from Plaintiff. through publication of injurious falsehood, which prevented and would prevent Plaintiff from obtaining future credit or would force him to obtain credit at

-17-

unfavorable and disadvantaged terms.

## XIX. Qualifications

I received my B.S. degree in Business Management from the University of Las Vegas, Nevada in 1983. The degree composed of Accounting and M.I.S.

Since, I had a private practice of computer business of writing business softwares and analyzing other computer softwares in what is called computer auditing. My practice included analyzing mortgage schedules similar to financing schedules as in this case.

Since 1986, I have been retained as an expert by both Plaintiff and Defendant counsel on numerous matters including consumer fraud; commercial fraud; real estate fraud; contract and business dispute. I have been qualified as an expert to testify before the Eight Judicial District Court in Las Vegas in previous cases.

My hourly rate for this matter is $ 200 for research and consulting, and $ 200 for deposition and trial testimony.

YEHUDA SHARON

EXHIBIT -1
pg. 1/2   NISSAN VAN LOAN - 00102434353780001
          $ 23,114.87 AT 12.08% PER-DIEM CALCULATION
----------------------------------------------------------------

| DATE: | PAYMENT: | DAILY PER-DIEM | INTEREST EARNED: | AMOUNT APPLIED TO PRINCIPAL: | BALANCE: |
|-------|----------|----------------|------------------|------------------------------|----------|
| | | | | | 23,114.87 |
| 07/13/1996 | | | | | 23,114.87 |
| 08/12/1996 | | | | | 23,114.87 |
| 09/11/1996 | | | | | 22,818.65 |
| 10/11/1996 | 525.10 | 7.63 | 228.88 | 296.22 | 22,527.02 |
| 11/11/1996 | 525.10 | 7.53 | 233.47 | 291.63 | 22,224.97 |
| 12/11/1996 | 525.10 | 7.44 | 223.05 | 302.05 | 21,927.90 |
| 01/11/1997 | 525.10 | 7.36 | 228.02 | 297.08 | 21,627.77 |
| 02/11/1997 | 525.10 | 7.26 | 224.97 | 300.13 | 21,303.09 |
| 03/11/1997 | 525.10 | 7.16 | 200.42 | 324.68 | 20,996.55 |
| 04/11/1997 | 525.10 | 7.05 | 218.56 | 306.54 | 20,679.92 |
| 05/11/1997 | 525.10 | 6.95 | 208.47 | 316.63 | 20,366.99 |
| 06/11/1997 | 525.10 | 6.84 | 212.17 | 312.93 | 20,044.11 |
| 07/11/1997 | 525.10 | 6.74 | 202.22 | 322.88 | 19,724.66 |
| 08/11/1997 | 525.10 | 6.63 | 205.65 | 319.45 | 19,401.93 |
| 09/11/1997 | 525.10 | 6.53 | 202.37 | 322.73 | 19,069.47 |
| 10/11/1997 | 525.10 | 6.42 | 192.64 | 332.46 | 18,740.02 |
| 11/11/1997 | 525.10 | 6.31 | 195.65 | 329.45 | 18,400.98 |
| 12/11/1997 | 525.10 | 6.20 | 186.07 | 339.03 | 18,064.67 |
| 01/11/1998 | 525.10 | 6.09 | 188.79 | 336.31 | 17,724.91 |
| 02/11/1998 | 525.10 | 5.98 | 185.34 | 339.76 | 17,364.06 |
| 03/11/1998 | 525.10 | 5.87 | 164.25 | 360.85 | 17,017.11 |
| 04/11/1998 | 525.10 | 5.75 | 178.15 | 346.95 | 16,660.97 |
| 05/11/1998 | 525.10 | 5.63 | 168.96 | 356.14 | 16,306.81 |
| 06/11/1998 | 525.10 | 5.51 | 170.94 | 354.16 | 15,943.62 |
| 07/11/1998 | 525.10 | 5.40 | 161.91 | 363.19 | 15,582.09 |
| 08/11/1998 | 525.10 | 5.28 | 163.58 | 361.52 | 15,216.86 |
| 09/11/1998 | 525.10 | 5.16 | 159.87 | 365.23 | 14,842.84 |
| 10/11/1998 | 525.10 | 5.04 | 151.08 | 374.02 | 14,470.03 |
| 11/11/1998 | 525.10 | 4.91 | 152.28 | 372.82 | 14,088.60 |
| 12/11/1998 | 525.10 | 4.79 | 143.67 | 381.43 | |

EXHIBIT -1
pg. 2/2

NISSAN VAN LOAN - 00102434353780001
$ 23,114.87 AT 12.08% PER-DIEM CALCULATION

---------------------------------------------------------------

| DATE: | PAYMENT: | DAILY PER-DIEM | INTEREST EARNED: | AMOUNT APPLIED TO PRINCIPAL: | BALANCE: |
|-------|----------|----------------|------------------|------------------------------|----------|
| 01/11/1999 | 525.10 | 4.66 | 144.55 | 380.55 | 13,708.04 |
| 02/11/1999 | 525.10 | 4.54 | 140.64 | 384.46 | 13,323.58 |
| 03/11/1999 | 525.10 | 4.41 | 123.47 | 401.63 | 12,921.95 |
| 04/11/1999 | 525.10 | 4.28 | 132.58 | 392.52 | 12,529.43 |
| 05/11/1999 | 525.10 | 4.15 | 124.40 | 400.70 | 12,128.73 |
| 06/11/1999 | 525.10 | 4.01 | 124.44 | 400.66 | 11,728.07 |
| 07/11/1999 | 525.10 | 3.88 | 116.45 | 408.65 | 11,319.41 |
| 08/11/1999 | 525.10 | 3.75 | 116.13 | 408.97 | 10,910.45 |
| 09/11/1999 | 525.10 | 3.61 | 111.94 | 413.16 | 10,497.28 |
| 10/11/1999 | 525.10 | 3.47 | 104.23 | 420.87 | 10,076.41 |
| 11/11/1999 | 525.10 | 3.33 | 103.38 | 421.72 | 9,654.69 |
| 12/11/1999 | 525.10 | 3.20 | 95.86 | 429.24 | 9,225.45 |
| 01/11/2000 | 525.10 | 3.05 | 94.65 | 430.45 | 8,795.00 |
| 02/11/2000 | 525.10 | 2.91 | 90.23 | 434.87 | 8,360.13 |
| 03/11/2000 | 525.10 | 2.77 | 80.24 | 444.86 | 7,915.27 |
| 04/11/2000 | 525.10 | 2.62 | 81.21 | 443.89 | 7,471.38 |
| 05/11/2000 | 525.10 | 2.47 | 74.18 | 450.92 | 7,020.46 |
| 06/11/2000 | 525.10 | 2.32 | 72.03 | 453.07 | 6,567.39 |
| 07/11/2000 | 525.10 | 2.17 | 65.21 | 459.89 | 6,107.50 |
| 08/11/2000 | 525.10 | 2.02 | 62.66 | 462.44 | 5,645.06 |
| 09/11/2000 | 525.10 | 1.87 | 57.92 | 467.18 | 5,177.88 |
| 10/11/2000 | 525.10 | 1.71 | 51.41 | 473.69 | 4,704.19 |
| 11/11/2000 | 525.10 | 1.56 | 48.26 | 476.84 | 4,227.35 |
| 12/11/2000 | 525.10 | 1.40 | 41.97 | 483.13 | 3,744.22 |
| 01/11/2001 | 525.10 | 1.24 | 38.41 | 486.69 | 3,257.54 |
| 02/11/2001 | 525.10 | 1.08 | 33.42 | 491.68 | 2,765.86 |
| 03/11/2001 | 525.10 | 0.92 | 25.63 | 499.47 | 2,266.39 |
| 04/11/2001 | 525.10 | 0.75 | 23.25 | 501.85 | 1,764.54 |
| 05/11/2001 | 525.10 | 0.58 | 17.52 | 507.58 | 1,256.96 |
| 06/11/2001 | 525.10 | 0.42 | 12.90 | 512.20 | 744.76 |
| 07/11/2001 | 525.10 | 0.25 | 7.39 | 517.71 | 227.05 |
| 08/11/2001 | 229.38 | 0.08 | 2.33 | 227.05 | 0.00 |
| | 30,685.18 | | 7,570.31 | | |

EXHIBIT -2

NISSAN VAN LOAN - 00102434353780001
$ 23,114.87 AT 12.08% PER-DIEM CALCULATION

| DATE: | PAYMENT: | DAILY PER-DIEM | INTEREST EARNED: | AMOUNT APPLIED TO PRINCIPAL: | BALANCE: |
|---|---|---|---|---|---|
| 07/13/1996 | | | | | 23,114.87 |
| 08/12/1996 | | | | | 23,114.87 |
| 09/11/1996 | | | | | 23,114.87 |
| 10/11/1996 | 525.10 | 7.63 | 228.88 | 296.22 | 22,818.65 |
| 11/11/1996 | 525.10 | 7.53 | 233.47 | 291.63 | 22,527.02 |
| 12/11/1996 | 525.10 | 7.44 | 223.05 | 302.05 | 22,224.97 |
| 01/11/1997 | 525.10 | 7.36 | 228.02 | 297.08 | 21,927.90 |
| 02/11/1997 | 525.10 | 7.26 | 224.97 | 300.13 | 21,627.77 |
| 03/11/1997 | 525.10 | 7.16 | 200.42 | 324.68 | 21,303.09 |
| 04/11/1997 | 525.10 | 7.05 | 218.56 | 306.54 | 20,996.55 |
| 05/11/1997 | 525.10 | 6.95 | 208.47 | 316.63 | 20,679.92 |
| 06/11/1997 | 525.10 | 6.84 | 212.17 | 312.93 | 20,366.99 |
| 07/11/1997 | 525.10 | 6.74 | 202.22 | 322.88 | 20,044.11 |
| 08/11/1997 | 20,054.69 | 6.63 | 205.65 | 19,849.04 | 195.07 |
| 09/11/1997 | | 0.06 | 2.00 | (2.00) | 197.07 |
| 10/11/1997 | 250.96 | 0.07 | 1.96 | 249.00 | (51.93) |
| | 25,556.65 | | 2,389.85 | | |

EXHIBIT -3

TRUTH-IN-LENDING DISCLOSURE STATEMENT

**FIXED RATE INSTALLMENT LOAN (NO CREDIT INSURANCE OFFERED)**

| BORROWER(S) | LENDER |
|---|---|
| YEHUDA SHARON<br>5143 RUDY LANE<br>LAS VEGAS NEVADA   89120 | CITIBANK (NEVADA), NA<br>3900 PARADISE ROAD  SUITE 127<br>LAS VEGAS NEVADA   89109 |

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | ACCOUNT NUMBER |
|---|---|---|---|---|
| 12.50 % | $ 2,453.89 | $ 12,000.00 | $ 14,453.89 | 64049 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 35 | $ 401.44 | MONTHLY BEGINNING JULY 30, 1989 |
| 1 | $ 403.49 | DUE JUNE 30, 1992 |
| | $ | |

**Recording and Filing Fees**

$ NA

If a disclosure is preceded by a box and the box is not checked, that disclosure is not applicable to your transaction. All numerical disclosures above assume that all payments are made on the due date disclosed above.

☐ You have the right to receive at this time an itemization of the Amount Financed.

☐ Late Charge: If payment is more than 10 days late, you will be charged the greater of $15.00 or 5% of the total amount of the payment due.

☐ This obligation has a demand feature.

☐ Required Deposit:  The annual percentage rate does not take into account your required deposit.

☒ You may obtain property insurance from anyone you want that is acceptable to Lender.

☒ Security: You are giving a security interest in:
   ☐ the goods or property being purchased.
   ☐ real estate
   ☒ brief description of other property    AUTOMOBILE

Prepayment: If you pay off early, you ☐ will  ☒ will not  have to pay a penalty.

If you pay off early, you ☐ may  ☐ will not  be entitled to a refund of part of the finance charge.

☐ Assumption: Someone buying your house cannot, except under certain circumstances, assume the remainder of the mortgage/deed of trust on its original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the schedule date, credit and property insurance, and prepayment refunds and penalties.

I have received a completed copy of this Truth-in-Lending Disclosure Statement, Itemization of Amount Financed, Note and Security Agreement, if applicable, before signing the Note or any Security Agreement or instruments securing such Note and Loan.

| _____ | _____ | _____ |
|---|---|---|
| Witness (to all) | Date | Borrower   YEHUDA SHARON |

| _____ | _____ | _____ |
|---|---|---|
| Witness | Date | Borrower |

| _____ | _____ | _____ |
|---|---|---|
| Witness | Date | Co-Maker |

VS-FRIL-(04-88)

EX 5

age is being requested by the Federal government for the purpose of monitoring compliance with Federal statutes that prohibit creditors from discriminating against appliants [applicants] on those bases. The creditor shall also inform the applicant(s) that if the applicant(s) chooses note to provide the information, the creditor is required to note the race or national origin and sex on the basis of visual observation or surname.

(d) *Substitute monitoring program.* A monitoring program required by an agency charged with administrative enforcement under section 704 of the Act [15 USCS § 1691c] may be substituted for the requirements contained in paragraphs (a), (b), and (c).

## § 202.14.  Enforcement, penalties and liabilities.

(a) *Administrative enforcement.* (1) As set forth more fully in section 704 of the Act [15 USCS § 1691c], administrative enforcement of the Act and this regulation regarding certain creditors is assigned to the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Board of Directors of the Federal Deposit Insurance Corporation, Office of Thrift Supervision, National Credit Union Administration, Interstate Commerce Commission, Secretary of Agriculture, Farm Credit Administration, Securities and Exchange Commission, Small Business Administration, and Secretary of Transportation.

(2) Except to the extent that administrative enforcement is specifically assigned to other authorities, compliance with the requirements imposed under the act and this regulation is enforced by the Federal Trade Commission.

(b) *Penalties and liabilities.* (1) Sections 706 (a) and (b) and 702(g) of the Act [15 USCS §§ 1691e(a) and (b) and 1691a(g)] provide that any creditor that fails to comply with a requirement imposed by the Act or this regulation is subject to civil liability for actual and punitive damages in individual or class actions. Pursuant to sections 704 (b), (c), and (d) and 702(g) of the Act [15 USCS §§ 1691c(b), (c), and (d) and 1691a(g)], violations of the Act or regulations also constitute violations of other Federal laws. Liability for punitive damages is restricted to nongovernmental entities and is limited to $ 10,000 in individual actions and the lesser of $ 500,000 or 1 percent of the creditor's net worth in class actions. Section 706(c) [15 USCS § 1691e(c)] provides for equitable and declaratory relief and section 706(d) [15 USCS § 1691e(d)] authorizes the awarding of costs and reasonable attorney's fees to an aggrieved applicant in a successful action.

(2) As provided in section 706(f) [15 USCS § 1691e(f)], a civil action under the Act or this regulation may be brought in the appropriate United States district court without regard to the amount in controversy or in any other court of competent jurisdiction within two years after the date of the occurrence of the violation, or within one year after the commencement of an administrative enforcement proceeding or of a civil action brought by the Attorney General of the United States within two years after the alleged violation.